IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01187-RPM

THOMAS L. MCLALLEN III,

      Plaintiff,

v.

SHERIFF KIRK M. TAYLOR, in his official and individual capacity;
UNDERSHERIFF J.R. HALL, in his official and individual capacity;
CAPTAIN LEIDE DEFUSCO, in his official and individual capacity;
INSPECTOR TOM PROUD, in his official and individual capacity;
BUREAU CHIEF DARLENE ALCALA, in her official and individual capacity;
LIEUTENANT DON LEACH, in his official and individual capacity; and
SERGEANT LEROY MORA, in his individual and official capacity.

      Defendants.

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT

---

      COMES NOW Plaintiff, Thomas McLallen III (hereinafter "Plaintiff" or "McLallen"), by and through counsel, Elkus & Sisson, P.C., respectfully submits his Response to Defendants' Motion for Summary Judgment (hereinafter the "Response") as follows:

### DISPUTED FACTS

      Contradicting and diluting Defendants' characterization that Sheriff Taylor had a "legitimate reason for his decision to terminate" the Plaintiff, was the fact that there was a long and arduous battle between the Fraternal Order of Police Lodge #7 ("Lodge 7) and the Sheriff Department about obtaining collective bargaining within the Agency.

**A.**    <u>**Battle for Collective Bargaining between Plaintiff and Sheriff Taylor**</u>

1.      Prior to the "battle" for collective bargaining, in 2007 the Plaintiff was the President of an employee association.  (Attached hereto as Exhibit 1 is Plaintiff's Deposition Transcript.  *See* Ex: 1, p. 112, lines 1-3).  As President of the employee association, the members were looking to transition from an employee association to a lodge that was part of a Union.  *See* Ex.1 p. 112, lines 1-25 and p. 113 lines 1-5.  To that end, the membership of the employee association collectively decided to join the Fraternal Order of Police.  Ex. 1, p. 113 lines 7-19.

2.      In June 2007 the employee association became Lodge 7 of the Fraternal Order of Police. Ex. 1, p. 117 lines 23-25. The same year the association became Lodge 7 the Plaintiff also was elected and became the President of the Lodge.  Ex.1, p. 121 lines 10-12.

3.      Shortly after Lodge 7 joined the F.O.P., the Plaintiff came to Sheriff Taylor to discuss the subject of collective bargaining within the agency.  In that conversation, Sheriff Taylor advised the Plaintiff that if Lodge 7 came at him "under the flag of collective bargaining" "that all bets were off the table…." Ex. 1, p. 128 lines 10-20.  The Plaintiff viewed these remarks as overt threats made by the Sheriff that he would use whatever means necessary to crush the FOP and the leadership thereby making the Union ineffective.  (Attached hereto as Exhibit 2 is Plaintiff's Affidavit in Opposition to the Motion for Summary Judgment).  *See* Ex. 2.

4.      Several months after the Plaintiff's meeting with Sheriff Taylor about obtaining his consent for collective bargaining, Lodge 7 took to vote whether to actively obtain collective bargaining within the agency despite Sheriff Taylor's overt opposition to collective bargaining.  See Ex. 1, p. 137 lines 7-25; see also Defendants' Exhibits A-12 thru A-14.  On or about February 4, 2008, Lodge 7 overwhelmingly voted in favor of pursuing collective bargaining for Sheriff Deputies.  Ex. 1, p.

139 lines 8-16.   After the vote, Plaintiff and Lodge 7 staged a press conference announcing its existence and plans to obtain collective bargaining rights with Pueblo County, and to have an equal voice in the workplace.  See Ex.2; see also, Ex. 3 (Attached hereto as Ex.3 are the news articles from the Pueblo Chieftain dated February 6, 2008 and February 8, 2008).

5.      On April 2, 2008, the Plaintiff, as President of Lodge 7, sent a correspondence to Sheriff Taylor in an effort to reach out to see if the parties could work together to obtain collective bargaining.  See Def. Ex. A-15; see also Ex. 1, p. 142 lines  8-18.  In addition, the Plaintiff's letter was also trying to dispel with concerns that Lodge 7 was "coming out against him" (i.e. Sheriff Taylor). Ex. 1, p. 142 lines 16-18.

6.      As the April 2, 2008 letter indicates, the desire to obtain collective bargaining "undeniably represents the employment interests of the majority of the line employees of the Sheriff's Office." Def. Ex. A-15.  The April 2nd letter further states, in part, that Lodge 7 disagrees with the legal premise that C.R.S. § 30-2-106 precludes a Colorado Sheriff from obtaining collective bargaining. See Def. Ex. A-15.

7.      In response, on April 3, 2008 Sheriff Taylor authored a letter which informed the Plaintiff that he believed "as a matter of principle that collective bargaining is fundamentally inconsistent with law enforcement as it relates to Sheriff's Offices.  Therefore, I will not recognize the FOP or any other organization as the bargaining agent for any Pueblo County Sheriff's Office employees. The constitutional and statutory authority granted to my office requires that one person be the ultimate decision-maker at the Sheriff's Office-the Sheriff."  Def. Ex. A-17.  "In matters relating to the operation of the Sheriff's Office, there are no equal partners."  "My views of the responsibilities of Sheriff are completely inconsistent with sharing such decisions through negotiations with a bargaining agent."  Def. Ex. A-17.

8.      As President of Lodge 7, the Plaintiff and Lodge 7 perceived Sheriff Taylor's letter as a definitive "line drawn in the sand" that the Sheriff would never recognize the FOP as a Union and bargaining agent.  See. Ex. 2.

9.      As a result of Sheriff Taylor's April 3rd statement, Lodge 7 elected not to concede to the Sheriff and decided to continue to fight for collective bargaining.  See Ex. 2.  To that end, the Plaintiff with the aid of Michael Violette of the State FOP Labor Council decided to introduce a proposed county ordinance that would allow Pueblo County Sheriff Deputies to collectively bargain with the Sheriff's Office.  See Ex. 2; See Ex. 4 (Attached hereto as Exhibit 4 is Michael Violette's Affidavit); see also, Ex. 5 (Attached hereto as Ex. 5 is Mr. Violette's April 20, 2008 letter to Sheriff Taylor).[1]

10.     As Ex. 5 indicates, Mr. Violette invited Sheriff Taylor to engage in a conversation with Lodge 7 in obtaining a Pueblo County ordinance which would grant collective bargaining rights to Pueblo County Sheriff Deputies.  Despite Lodge 7's and Mr. Violette's effort, Sheriff Taylor ignored the invitation.  See Ex. 4.

11.     In light of ignoring the April 20th letter (Ex.5); the Plaintiff with Mr. Violette and the State FOP's General Counsel, they went forward and drafted an ordinance that would give Pueblo County Sheriff Deputies bargaining rights.  (Attached hereto as Ex. 6 is a copy of the draft ordinance).  In an effort to achieve the goals of Lodge 7, the Plaintiff and Mr. Violette met with County Commissioners John Cordova, Anthony Nunez and J.E. Chostner to discuss the passage of

---

[1] As part of its organization, the State Fraternal Order of Police has a labor council division which assists local FOP lodges with obtaining collective bargaining within their agencies.  Additionally, the labor council also provides assistance to local FOP lodges regarding labor disputes and labor issues. See. Ex.4.  Mr. Violette is the head of the labor council for the State FOP.  See Ex.4.  Additionally, Mr. Violette was providing assistance with Lodge 7 in obtaining collective bargaining with the Pueblo County Sheriff's Office.  See Ex. 4.

a collective bargaining ordinance.  See Ex. 2 and 4.  Commissioners Cordova and Chostner both indicated their support for a collective bargaining ordinance.  See Ex. 2 and 4.

12.     Shortly after the meeting with the County Commissioners, Sheriff Taylor confronted the Plaintiff and told him that he was upset that the Plaintiff and Mr. Violette went behind his back and spoke to the County Commissioners to get a collective bargaining ordinance passed.  See Ex. 2. Sheriff Taylor advised the Plaintiff that Lodge 7 was taking a course of action that the Sheriff vehemently opposed.  See Ex. 2.  Despite being confronted, the Plaintiff did not abandon his charge to get collective bargaining.  Ex. 2.

13.     On July 7, 2008, the Plaintiff, Mr. Violette, FOP General Counsel (David Osborne), Sheriff Taylor and Assistant County Attorney Peter Blood, met with the County Commissioners to discuss the proposed ordinance as presented by the Plaintiff and Lodge 7.  Ex. 2.  During the presentation to the County Commissioners, Sheriff Taylor openly stated to the Commissioners and all that attended the July 7th meeting, that he did not care how many votes the Commissioners have he will not follow the Commissioners decision to have collective bargaining.  The only way the Sheriff will allow collective bargaining is by Federal or State mandate.  See Ex. 2 and 4; see also Exhibit 7 (Attached hereto as Ex. 7 is Mr. Violette's deposition transcript); See Ex. 7, p. 93 lines 4-25.  While making this statement Sheriff Taylor was visibly upset and his demeanor was that of agitation.  Ex. 2, Ex. 4, Ex. 7, p. 94 lines 1-11.

14.     Despite Plaintiff's effort, the County Commissioners denied the request to pass an ordinance allowing Pueblo County Sheriff's Office Deputies the right to have collective bargaining on wages and benefits. See Def. Ex. A-20.

15.     After the July 2008 presentation to the County Commissioners the Plaintiff and Lodge 7

continued to try achieve collective bargaining by garnering political pressure from Sheriff Taylor's constituency (i.e. other labor unions). Ex. 2, Ex. 4, see Ex. 8 (Attached hereto as Ex. 8 is Plaintiff's July 18, 2008 letter).  As Ex. 8 indicates, Plaintiff states that "[w]e must get involved in the political process if we want success.  That is exactly what we will do.  We must support and work hard to elect persons who are sympathetic with our goals."  To that end, the Plaintiff, Lodge 7 and Mr. Violette began a campaign to inform other labor unions that despite his political platform Sheriff Taylor was not truly sympathetic or supportive of labor unions. Ex. 2 and 4.  It was Plaintiff's and Mr. Violette's intent to either have Sheriff Taylor lose on a reelection bid for Sheriff or have the other labor organizations provide the needed political pressure to force Sheriff Taylor and/or County Commissioners in supporting a collective bargaining measure.  Ex. 2 and 4; see Ex. 7, p 98 lines 8-25; 99 lines 1-25.

16.     In achieving the goal as stated in Ex. 8, in 2008 Mr. Violette attended an AFL-CIO meeting to explain to the labor organization Sheriff Taylor's position on collective bargaining.  Ex. 7, p. 101, lines 1-14.  Attending the meeting with Mr. Violette was Lodge 7's Vice President Jason Guillardo.  Just prior to entering the meeting with Mr. Violette, Deputy Guillardo became very scared and immediately fled the building.  According to Mr. Violette, Deputy Guillardo stated "Oh, my God. Taylor is here.  If he sees me here, it's just going to be bad."  Ex. 7, p.101, lines 18-22.   As Mr. Violette stated in his deposition, Deputy Guillardo's statement put him on notice and confirmed what he was hearing from Lodge 7 members that Sheriff Taylor was very upset that the Plaintiff and Mr. Violette were talking to other labor organizations about Sheriff Taylor's anti-union position. Ex. 7 p. 101, lines 23-25; p. 102, lines 1-17.

17.     During the AFL-CIO meeting Sheriff Taylor portrayed himself as pro-labor/pro collective bargaining.  At which point, Mr. Violette openly challenged and contradicted the statements made

by Sheriff Taylor regarding collective bargaining.  According to Mr. Violette, Sheriff Taylor was visibly upset by Mr. Violette's statements.  Ex. 4.  Afterwards, Mr. Violette contacted the Plaintiff and advised him of the confrontation with Sheriff Taylor and told the Plaintiff to "watch out" because the Sheriff was extremely upset that the FOP confronted him in front of another labor organization.  Ex. 4.

18.     During the same time frame as the AFL-CIO meeting, Sheriff Taylor endorsed Mr. John Cordova for a permanent seat as County Commissioner. Ex. 2 and 4.  Being that Mr. Cordova ultimately opposed Lodge 7's collective bargaining ordinance, Lodge 7 openly gave its support to Mr. Cordova's opponent Ms. Dorothy Boucher, who strongly supported Lodge 7's position on collective bargaining.  Ex. 2.  Lodge 7 actively campaigned and advertised their support for Ms. Boucher, which was directly in opposition to the endorsement given by Sheriff Taylor to Mr. Cordova.  Ex. 2 and 4.  Sheriff Taylor was again upset that Plaintiff and Lodge 7 took another position that was contrary to the will of the Sheriff.  Ex. 2.  Specifically, it was conveyed by the Sheriff to the Plaintiff that it was embarrassing that his own Deputies were not in sink with him. Ex. 2.

19.     Furthering evidencing Sheriff Taylor's resentment of the Plaintiff and his involvement in getting collective bargaining is the event which occurred during the September, 2008 All-Hands meeting.  The September, 2008 All-Hands meeting was a gathering of Pueblo County Sheriff Deputies and Command Staff to discuss matters of importance and team building within the Agency.  Ex. 2.  During the All-Hands meeting Sheriff Taylor gave a speech which included comments about Lodge 7 obtaining collective bargaining.  Specifically, Sheriff Taylor had the following comments:

      1.     [T]here's been some problems that have come up within the agency as we're doing all

this stuff here that have taken me away from my primary mission, which is to make sure that you have all the equipment and resources necessary to do your job….What has happened or what started to happen, and I won't let it happen, is for us to be two agencies, sheriff one and sheriff two.  What I found – what I've experienced, because I've never been sheriff before, is that it seems to me throughout the 20 months that I have been the sheriff, everybody wants to be sheriff without the benefit of election….What I won't do is I won't give away the statutory authority that was placed upon me in 2006.  So having said that, I want to talk a little bit about this Fraternal Order of Police and what they've done in coming to the agency.  That's where I (inaudible) separation, we won't have two departments here.  We have one sheriff for Pueblo County.  And today that sheriff happens to be me."

(Attached hereto as Ex. 9 is a transcription of DVD of All-Hand's Meeting); see Ex. 9, p. 2 lines 21-25; p. 3 lines 5-12 and lines 19-25; p. 4 lines 1-6.[2]

2.      The city, where I worked, was an at-will employer.  We wanted a legal defense fund because we wanted to hang out our houses, our boats, (inaudible).  Some of them did.  And so I was a very big proponent to it and we were able to get that done.  At no time did we try with our (inaudible) to tell our chief how to do his job. Okay?  And that's the problem that's happening here.  Since – now, if you don't know already, I'm a very, very patient man.  So for over one year I've done nothing to effect anything that the FOP has done or tried to do or attempted to do. But I'm really getting tired of getting stabbed in the back."  Ex. 9, p. 7 lines 20-25; p. 9 lines 1-8.

3.      I'm not a fire chief for the city and county.  I'm an elected official.  I was elected by the collective, which is this community that we live in, right? That's a huge difference. There's not one other sheriff in this state that has what these guys want, collective bargaining for benefits and wages." Ex. 9, p. 10 lines 5-12.

4.      [P]rior to consideration of any request for recognition the organization seeking recognition of any request for recognition the organization seeking recognition must acknowledge and accept in writing the fact that any recognition and subsequent collective bargaining will not include negotiation for pay and benefits. Okay?  This is the county union recognition policy. Okay?  This is the second (inaudible) that they could have tried. Okay?  Had they worked with me after I got elected, I'm not sure I would have (inaudible).  They didn't choose path one or path two.  They chose path three.  We want collective bargaining for (inaudible) and we want you to give it to us.  We want you to violate what you believe are your statutory obligations as sheriff.  I said I will not. Ex. 9, p. 11 lines 18-25; p. 12 1-9.

5.      This is last year, folks.  I've been fighting this fight for over a year.  I've been having to spend my resources on dealing with this issue within our agency so I can't deal with anything else. And I'm done.  Ex. 9, p. 14 lines 3-7.

6.      They want to go where nobody else has gone.  Great.  Change the statute.  Well, it's not going to happen as long as I'm the sheriff.  The last conversation I had with the head of my party, who came to my office, which was the catalyst for this letter was the (inaudible) representatives have told the head of my party that if I do not acquiesce to the wants of the Fraternal Order of Police

---

[2] Defendants' provided in their Fed.R.Civ.P. 26(a)(1) the DVD of the All-Hands meeting.  However, because Plaintiff's cannot attach the DVD to this Response Motion, the undersigned had to get the DVD transcribed in order to be used for this response motion.

that they will guarantee that I will have a democratic opponent in the primary for the 2010 election. Okay? Great. That was good. Bring it on. Ex. 9, p. 16 lines 17-25; p. 17 lines 1-3.

Also during the All-Hands meeting, Sheriff Taylor disseminated to all that attended a letter addressed to the Plaintiff. *See* Def. Ex. A-20. Such letter, in the eyes of Lodge 7 and the Plaintiff, was anti-union. Ex. 2.

20.     As Def. Ex. A-20 indicates, Sheriff Taylor would not recognize Lodge 7 unless the following conditions were met: (1) written recognition by Plaintiff that the FOP is not a labor union or bargaining agent; (2) written by-laws must be approved by all Sheriff Office members; (3) FOP must make a written acknowledgment not to communicate of any kind that the FOP is a labor union or a bargaining agent of Sheriff' Office members; (4) FOP must put in writing that no action of the FOP may interfere with the mission of the Sheriff's Office; and (5) pledge that the any effort by the FOP to be a labor union must exclude a negotiation for pay and benefits.[3]

21.     When Sheriff Taylor disseminated the September 22nd letter during the All-Hands meeting the Plaintiff felt that Sheriff Taylor was trying to intimidate him. Ex. 1, p. 336 lines 1-25; p. 348 lines 6-9. As the Plaintiff stated during his deposition, when Sheriff Taylor's letter was being disseminated Captain DeFusco comes directly over to where Plaintiff was seated and stood by him while Sheriff Taylor lectured to all staff and Deputies that the FOP was being disrespectful to the Sheriff and that Lodge 7 was going rogue. Ex. 1, p. 334 lines 2-25; p. 335 lines 1-2; p. 336 lines 1-25.

22.     During his deposition, Sheriff Taylor testified that he was prompted to draft the September 22nd letter because in his eyes Lodge 7 performed a series of bad acts. (Attached hereto as Ex. 10 is

---

[3] Sheriff Taylor testified during his deposition that he wanted to restrict Lodge 7 from communicating to the public that they were a labor union because in his opinion Lodge 7 was running amuck. To that end, Sheriff Taylor did not want Lodge 7 to publicly communicate they were a union. In addition, Sheriff Taylor wanted to restrict Lodge 7 from having their own website which would even mention or say that the Lodge was a union. Ex. 10, p. 176 lines 5-25; p. 177 lines 1-25; p. 178 lines 1-25; p. 179 lines 1-6.

Sheriff Taylor's deposition transcript) see Ex.10, p. 166, lines 12-19.  In Sheriff Taylor's opinion, the bad acts included: (1) being told that he was anti-union; (2) the FOP held press conference concerning collective bargaining; (3) going to the County Commissioners to garner support for collective bargaining when the Sheriff opposed it; and (4) going to the Pueblo County District Attorney's Office to get support for collective bargaining.  Ex. 10, p. 166, lines 23-25; p. 167, lines 1-25 and p. 168 lines 1-22.  These "bad acts", where admittedly legal by the Sheriff, clearly upset him.  Ex. 10, p. 168, lines 20-25; p. 169 lines 1-5.

23.     After the All-Hands meeting, the Plaintiff and the FOP's General Counsel sent objections to Sheriff Taylor's September 22nd letter.  Such objections included a claim that Sheriff Taylor was creating a chilling effect on union activity with an attempt to break-up Lodge 7.  See. Def. Ex. A-21 and A-22.  Despite their objections, Sheriff Taylor never removed the restrictions he imposed and set forth in his September 22nd letter.  Ex. 10, p. 189 lines3-7; p. 193, lines 1-16.

24.     After the September 2008 All-Hands meeting the Plaintiff felt more intimated and was concerned about his future with the Sheriff's Office.  Ex. 2.  Accordingly, the Plaintiff limited his advocacy for trying to get collective bargaining.  Ex. 2.

25.     For several months Plaintiff limited his visibility as the voice of collective bargaining for Lodge 7.  However, on February 16, 2009, the Plaintiff testified before the State General Assembly pertaining to an Officer's Bill of Rights.  Ex. 2; see also, Def. Ex. A-27.  The Officer's Bill of Rights included a statewide mandate for collective bargaining.  Ex. 2.  .  During his testimony before the General Assembly, the Plaintiff openly stated that his employer (the Sheriff) was lying to his constituency about having a great working relationship with his Deputy Sheriffs. Def. Ex. A-27, p. 3 line 21-23; p. 4 line 1.  In fact, Plaintiff was highly critical of Sheriff Taylor's interaction with Lodge 7 in getting collective bargaining. Def. Ex. A-27, p. 4 lines 1-14.

26.     A couple days after he testified, Sheriff Taylor confronted the Plaintiff in the Sheriff Office

parking lot. Ex. 1, p. 203, lines 21-25; p. 204 lines 1-25; p. 206 lines 10-25.   Sheriff Taylor approached the Plaintiff and told him "I understand you were up on the hill yesterday….I don't appreciate being blind-sided by my colleagues to find those things out." Ex. 1, p. 206 lines 15-25; p. 207 lines1-2.  According to the Plaintiff, the Sheriff was "pissed" and was very "upset." Ex. 1, p. 207 lines 14-15.  The Plaintiff felt threatened by the Sheriff.  Ex. 1, p. 209 lines 11-18.  This feeling of intimidation was further exacerbated when Undersheriff Hall approached the Plaintiff in the parking lot and sarcastically patted Plaintiff on the back saying "You're doing a great job."  Ex. 1, p. 212 lines 17-24.

27.     Right after Plaintiff's interaction with Sheriff Taylor and Undersheriff Hall, Plaintiff called Mr. Violette. Ex. 2 and Ex. 4.  In his conversation with Mr. Violette he relayed the event which just transpired.  Ex. 2 and Ex. 4.  In addition, the Plaintiff expressed to Mr. Violette that he was afraid and that he believed the Sheriff was going to fire him.  Ex. 2 and Ex. 4.

**B.     Campaign of Retaliation**

28.     Subsequent to the February 16, 2009 testimony before the General Assembly, Plaintiff received various disciplinary actions which Plaintiff believes were brought as a means to remove Plaintiff based on his efforts to get collective bargaining, unionizing Lodge 7 and because of his testimony on February 16, 2009. Ex. 2.  The first occurred only two (2) months after Plaintiff's February, 2009 testimony.  Ex. 2.

29.     The first disciplinary action which led to his ultimate termination was an incident which occurred on April 18, 2009.   On this date the Plaintiff received a verbal counseling from his supervisor Lieutenant DeSalvo.  (Attached hereto as Ex. 11 is Lt. DeSalvo's verbal counseling).  The basis for the verbal counseling was that Plaintiff (a Sergeant) became involved in an attempt to restrain an inmate named Joseph Birchfield as well as using profanity upon being physically struck by the inmate. Ex. 11.  During Lt. DeSalvo's deposition she acknowledged that a verbal reprimand

is the lowest form of discipline that can be issued. (Attached hereto as Ex. 12 is a transcript of Lt. DeSalvo's deposition); see Ex. 12, p. 23 lines 8-10. Knowing this, Lt. DeSalvo could have recommended a much higher degree of sanction to include demotion or suspension; however, the facts and circumstances in the Birchfield incident only gave rise to the lowest form of agency discipline. Ex. 12, p. 22 lines 9-25; p. 23 lines 1-10. Once Plaintiff received the verbal reprimand he did not believe that the incident would be subject to further disciplinary action or review. Ex. 1, p. 241 lines 5-14.

29. To Plaintiff's surprise the Birchfield matter was not finalized or resolved with a verbal warning. Ex. 2. Instead, Plaintiff was ordered to meet with Captain Leide Defusco concerning the April 18th incident. See Def. A-37.

30. During Plaintiff's meeting with Captain Defusco the Plaintiff stated what he believed occurred. The Plaintiff expressed that the other officers were unable to control inmate Birchfield which caused the Plaintiff to render aid by attempting to gain control of Birchfield's legs. Def. Ex. A-37. Plaintiff also expressed that the profanity he used was not intentional but rather "blurted out" the profanity upon being assaulted. Def. Ex. A-37.

31. On May 15, 2009, Captain Defusco drafted a memorandum to Chief Darlene Alcala. See Def. Ex. A-38. In that memorandum Captain Defusco recommended that the Plaintiff be removed from the STAT team, as a leader and tactical officer, as well as recommending Plaintiff's demotion. Def. Ex. A-38. In support of the recommendation of discipline Captain Defusco's stated that the Plaintiff (a supervisor) involved "himself in a use of force when there is a sufficient amount of Deputies trying to control the situation. They were not being assaulted in any way; they were just trying to control Birchfield so medical could tend to him. The supervisor's role is to observe and offer guidance, not to engage and become part of the use of force. **Lt. Debbie Purkett was standing nearby and observing, the same stance Sgt. McLallen should have taken**." See Def.

Ex. A-38 p. 2 [Emphasis added].

32.     Calling into question Captain Defusco's true motivation in recommending discipline is his characterization of Lt. Purkett's involvement in the Birchfield incident.  As stated above, Captain Defusco informs Chief Alcala that Lt. Purkett was standing nearby and observing the conflict; however, during his deposition Captain Defusco admits that he reviewed Lt. Purkett's memo prior to his May 14, 2009 meeting with the Plaintiff.  (Attached hereto as Ex. 13 is a transcript from Captain Defusco' deposition) see Ex. 13, p. 23 lines 5-25; (see also Ex. 14 which is attached hereto as Lt. Purkett's May 7, 2009 memorandum).  During his deposition Captain Defusco admits that Lt. Purkett (like the Plaintiff) went "hands-on" inmate Birchfield.  Ex. 13, p. 25 lines 3-17.  Despite going "hands-on" with inmate Birchfield, unlike the Plaintiff, Lt. Purkett was not disciplined.  Ex. 13, p. 25 lines 15-17.  It is clear that Captain Defusco misrepresented Lt. Purkett's real involvement in the Birchfield incident to Chief Alcala.[4]

33.     Further questioning Captain Defusco's recommendation in the Birchfield matter is that he admittedly believed the Plaintiff when he said that he used profanity because of pain and that Captain Defusco was unaware of any other Sergeant demoted for profanity.  Ex. 13, p. 30 lines 23-25; p. 31 lines 1-10.  Additionally, Captain Defusco understood that if demotion was recommended the Sheriff would have the final word.  Ex. 13, p. 34 lines 4-12.  According to Captain Defusco he was personal friends with Sheriff Taylor and was aware of Sheriff Taylor's position on collective bargaining.  Ex. 13, p. 101 lines 15-23; p. 105 lines 5-10.

34.     On May 20, 2009, Chief Alcala sustained the policy violations and recommended that the Plaintiff receive a five-day suspension.  See Def. Ex. A-40.

35.     Prior to recommending the five-day suspension, Chief Alcala held a pre-disciplinary meeting

---

[4] During his deposition Captain Defusco admitted that there is no policy that prohibits a sergeant from going hand-on with an inmate.  Ex. 12, p. 26 lines 8-10.

with the Plaintiff on May 19, 2009.  See Def. Ex. A-39.  During his meeting with Chief Alcala, Plaintiff apologized for his actions but that the use of profanity was not aimed at anyone but was a reaction to pain.  Def. Ex. A-39, p. 1. According to Chief Alcala, she has no evidence that this explanation by the Plaintiff was false.  (Attached hereto as Ex. 15 is a transcript of Chief Alcala's deposition); see Ex. 15, p. 55 lines13-19.

36.     In sustaining discipline, Chief Alcala also took issue with the Plaintiff being a Sergeant that went "hands-on" with inmate Birchfield.  See Def. Ex. A-40.  Similar to Captain Defusco, issues arise about Chief Alcala's motivation in recommending discipline, specifically, the fact that she received Lt. Purkett's memorandum of the Birchifield incident prior to her May 19th pre-disciplinary meeting with the Plaintiff.  Ex. 15, p. 67 lines11-24.  As Chief Alcala stated in her deposition, Lt. Purkett's memorandum states that the Lieutenant also attempted to restrain inmate Birchfield by holding his feet.  Ex. 15, p. 68 lines 10-22.  Being that Lt. Purkett was the Plaintiff's supervisor during the Birchfield incident, Chief Alcala admits that Lt. Purkett bears the responsibility for the actions of the Plaintiff in trying to restrain inmate Birchfield and that Lt. Purkett should have been disciplined, at the very least, because she too was holding inmate Birchfield's feet in an attempt to restrain him.  Ex. 15, p. 69 lines 1-25; p. 70 lines 1-5.  Yet, for whatever reasons, she was not.  Ex. 13, p. 25 lines 15-17.

37.     When recommending discipline in the Birchfield incident Chief Alcala was aware that Plaintiff was trying to get collective bargaining within the Sheriff's Office.  Ex. 15, p. 161 lines 20-25. Chief Alcala also admits that pushing for collective bargaining was not to the "FOP's benefit in trying to have a relationship with the Sheriff."  Ex. 15, p. 159 lines 5-9.

38.     Subsequent to the April 18, 2009 Birchfield incident, on May 14, 2009, Chief Alcala wrote to Undersheriff Hall that an internal affairs investigation be opened regarding an incident that occurred with the Plaintiff at the Tumbleweed Tavern on May 2-3, 2009.  See Def. Ex. A-49.  On May 22,

2009, Plaintiff was informed that an internal investigation was being opened based on two (2) incidents at the Tumbleweed Tavern in Pueblo Colorado. See Def. Ex. A-51.

39.     First, as it pertains to the May 2-3, 2009 Tumbleweed Tavern incident, it had been alleged by the Pueblo County Sheriff's Office that Plaintiff engaged in various policy violations. See Def. Ex. 54, pp. 30-35. The substance of the policy violations surrounding the May 2-3, 3009 incident is that Plaintiff violated Colorado statute by unlawfully giving alcohol to someone under the age of twenty-one (21); that Plaintiff engaged and was involved in an unlawful "bar fight" at the Tumbleweed Tavern; Plaintiff failed to stop Deputy Flores from engaging in improper activity; and Plaintiff failed to report the disturbance which occurred at the Tumbleweed Tavern incident. See Def. Ex. 54, pp. 30-35. Plaintiff emphatically denies these allegations. See Def. Ex. A-56; see also Ex. 2.

40.     Plaintiff states that he was not involved in a bar fight and that he did not violate any Colorado State law stemming from the May 2-3, 2009 Tumbleweed incident. Ex. 2. In fact, Plaintiff tried to stop the bar brawl between Deputy Flores and the other patron. Def. Ex. A-54, p. 9. This fact is corroborated by the criminal investigating officer Donald Leach. As Donald Leach stated during his deposition:

Q; Was your investigation of the May 2nd and 3rd incident limited to criminal conduct?
A: The purpose for the investigation was if somebody said something during the investigation that would meet a policy violation, it would have been documented.

(Attached hereto as Ex. 16 is a transcript of Don Leach's deposition) (see Ex. 16, p. 15 lines 16-21)

Q: Okay. And during the course of your investigation did you specifically determine whether or not Sergeant McLallen had violated any laws, criminal statutes?
A: Yes.
Q: And what was that determination?
A: We found no statutes that he violated.
Q: Did you determine whether or not Sergeant McLallen interfered in Sergeant Bryant's initial investigation?
A: We found no evidence of that.

Ex. 16, p. 21 lines 2-8.

Q: Okay. During the course of your investigation of the May 2nd and 3rd Tumbleweed

incident, did you determine if Leonard Flores was coached in his response by Tommie McLallen?
      A: No.
      Q: And did Mr. Flores give you any indication that he was coached by Mr. McLallen?
      A: No.

Ex. 16, p. 24 lines 1-8.

      Q: Did you make a determination as to whether or not Mr. McLallen was a suspect t or a witness?
      A: The conclusion was he was a witness, not a suspect.
      Q: Did you determine if Sergeant McLallen gave alcohol to Brandon Lozano?
      A: Yes.
      Q: And what was the conclusion of that part of the investigation?
      A: He did not provide Brandon alcohol.

Ex. 16, p. 24 lines 16-25 and p. 25 line 1.[5]

41.      Further contradicting Inspector Proud's claim that there are "disinterested witnesses or other facts proving" the policy violations is the investigation report of Joseph Muldoon. (Attached hereto as Exhibit 17 is Mr. Muldoon's investigation report)[6]   As Exhibit 17 indicates, numerous witnesses corroborate Plaintiff's position that the Plaintiff was not involved in the bar fight and did not act inappropriately prior to and during the incident.

42.      Also contradicting Inspector Proud's internal affairs findings, specifically that Plaintiff failed to report the disturbance which occurred at the Tumbleweed Tavern incident on May 2-3, 2009, is Plaintiff's email to his supervisors approximately twelve (12) hours after the incident. (Attached hereto as Exhibit 19 is Plaintiff's May 3, 2009 email).

43.      Regarding the May 12, 2009 incident, the allegation is that while at the Tumbleweed Tavern

---

[5] Inspector Proud used the criminal investigation of Donald Leach as part of his internal affairs memorandum. (Attached hereto as Exhibit 18 is the deposition transcript of Tom Proud); see Ex. 18, p. 15 lines 15-23, p. 16 lines 5-11.   According to Inspector Proud's Internal Affairs memorandum he claims that Plaintiff gave Lozano alcohol; however, neither Donald Leach (nor any other criminal investigator) came to that conclusion.   Inspector Proud claimed in his deposition that Plaintiff said he did; however, he later recanted that position when he could not find an interview to support that proposition. Ex. 18, p. 27 lines 2-25; p. 28 lines 1-4.
[6] Joseph Muldoon was hired by the FOP to conduct a parallel investigation with the Pueblo County Sheriff's Office.

Plaintiff provoked a fight with an ex-offender and a federal corrections officer.  Def. Ex. A-54, p. 32.  Additionally, the Sheriff's Office also alleged that the Plaintiff called the corrections officer a "cocksucker."  Def. Ex. A-54, p. 33.  According to Inspector Proud, based upon his investigation into this matter these factual allegations did occur.  Def. Ex. A-54, p. 33.

44.     The Plaintiff emphatically denied provoking a fight with an ex-offender.  Def. Ex. A-54, pp. 28-29.  Moreover, the Plaintiff denies ever having any conversation or interaction with a correctional officer at the Tumbleweed Tavern on May 12, 2009. Def. Ex. A-54, p.29.

45.     The only witness that supports the May 12, 2009 internal affairs allegations against the Plaintiff is the complaining party, correctional officer Jim Reese.  Def. Ex. A-54, pp.25-30.  Deputy Flores who was present during the May 12th incident claims that Plaintiff did not interact with a correctional officer and did not harass an inmate.  See Ex. 17, BATES 0529.  Deputy Flores further stated that the Sheriff's Office "wanted Tommie, I was just collateral damage.  That's why I was spared."  Ex. 17, BATES 0529.

46.     Corroborating Plaintiff's position on the night of May 12, 2009 at the Tumbleweed Tavern is the ex-offender Lawrence Lock.  Ex. 17, BATES 0539-0541.  Mr. Lock was at the Tumbleweed Tavern on May 12, 2009.  Ex. 17, BATES 0539-0541.  Mr. Lock stated that it was Deputy Flores that was disrespectful and rude to him.  Ex. 17, BATES 0540.  According to Mr. Lock, the Plaintiff immediately intervened and stopped the interaction between Deputy Flores and Mr. Lock.  Mr. Lock stated that the Plaintiff was respectful to him and did not harass him.   Ex. 17, BATES 0540.  Of note, Mr. Lock stated that he was interviewed by Inspector Proud on or about May 18, 2009.  Mr. Lock stated that "it was obvious Proud was singling out Tommie…."  Mr. Lock further stated that when he told Inspector Proud that Deputy Flores was out of control, Inspector Proud ignored his comments about Deputy Flores.  Mr. Lock stated that "as he spoke, Proud had Thomas and Lenny's pictures lying on the table they were sitting at….Proud kept pushing Thomas' picture

forward, closer and closer…asking him questions about Thomas' behavior in the bar….Proud was focused primarily on Thomas." Ex. 17, BATES 0540.[7]

47.     During Inspector Proud's deposition he testified that Mr. Lock, the purported victim of the May 12th Tumbleweed incident, did not corroborate Mr. Reese's story.  see Ex. 18, p. 45 lines 13-17.  Inspector Proud further testified that neither the Plaintiff nor Deputy Flores corroborated Mr. Reese's allegation.  Ex. 18, p. 47 lines 8-11; p. 48 lines 1-2.  Curious, Inspector Proud stated that there were other individuals that corroborated Mr. Reese's allegation; however, those purported witnesses and their statements were not included in his report.  Ex. 18, p. 43 lines 17-25; p. 44 lines 1-25; p. 45 lines 1-12.

48.     The internal affair findings of Inspector Proud were submitted to Plaintiff's supervisor Captain Defusco for his review and consideration.  Captain Defusco then made his recommendation to Chief Alcala, which recommendation was termination.  See Def. Ex. A-55.

49.     There are various issues contained within Captain Defusco's recommendation that questions the integrity of his findings.  First, it appears that Captain Defusco was desperately trying to find that Plaintiff made false statements by including such claims that because the Plaintiff used words such as "I don't recall that happening" or because during the interview he stated he bought a 12 pack of beer then corrected himself and said a 6 pack, that Plaintiff must be departing from the truth.  Def. Ex. A-55, pp.2-3.[8]   Second, Captain Defusco is further critical of the Plaintiff for harassing an ex-offender while the Plaintiff and Deputy Flores were "drunk and belligerent."  Not surprisingly, only

---

[7] Inspector Proud did not include the May 18, 2009 Lawrence Lock's interview into his final May 28, 2009 memorandum.  There appears to be a question of fact as to whether Inspector Proud in fact interviewed Mr. Lock prior to his May 28, 2009 report and if so why he did not include that information into his final report.

[8] Captain Defusco is critical of Plaintiff for not recalling specific details of an entire conversation however in Inspector Proud's investigation summary the Plaintiff reasoned that "due to the loudness of the Tavern he could not hear…." Def. Ex. 54, p. 10.  This fact was not included in Captain Defusco's memo.

Mr. Reese provides information to support this claim.  Both Plaintiff and Deputy Flores deny this allegation as does Mr. Lock.  Def. Ex. A-54, pp.25-30; Ex. 17, BATES 0539-0541.

50.     On June 8, 2009, the Plaintiff engaged in a pre-disciplinary meeting with Chief Alcala regarding the recommendations made by Captain Defusco.  See Def. Ex. A-56.

51.     The Plaintiff advises Chief Alcala that he did not believe that he violated any departmental policies regarding the incidents which occurred at the Tumbleweed Tavern.  Def. Ex. A-56.

52.     Ms. Betty McCoy was a Pueblo County employee that was the administrative assistant to Chief Alcala.  (Attached hereto as Exhibit 20 is the deposition transcript of Ms. McCoy); Ex. 20, p. 14 line 25; p. 15 lines 1-3.  As Chief Alcala's administrative assistant, she would be present during a pre-disciplinary meeting between the Deputy and the Chief and would take notes and record the meeting. Ex. 20, p. 18 lines 6-25; p. 19 lines 1-6.

53.     Ms. McCoy separately sat in on both the Plaintiff's and Deputy Flores' pre-disciplinary meeting with Chief Alcala as it pertains to the Tumbleweed Tavern investigation.  Ex. 20, p. 30 lines 5-7; see also, Def. Ex. A-56.    According to Ms. McCoy, the Chief was more intense with the Plaintiff than Deputy Flores.  As Ms. McCoy stated, "I believe something about the McLallen thing was more intense.  And the Flores one, to me, it seemed normal, like any other discipline…"  Ms. McCoy felt the air in the room was angry and that she (McCoy) attributed the intense atmosphere to come from Chief Alcala and not from the Plaintiff.  Ex. 20, p. 30 line 25; p. 31 lines 1-7 and lines 13-23; p. 32 lines 3-12.  Moreover, based on what she observed, Ms. McCoy felt that Plaintiff was not being treated fairly.  Ex. 20, p. 32 lines 13-20.  In fact, as Ms. McCoy testified in her deposition, between 2008-2009 the Sheriff's Office chain of command was not pro-union.[9]  Ex. 20, p. 37 lines

---

[9] Ms. McCoy was aware that people dropped out of the FOP for fear of retaliation.  Ex. 20, p. 40 lines 1-5.  Ms. McCoy was also aware that the chain of command criticized the Plaintiff because he was fighting for union rights and that the chain of command supported Sheriff Taylor's position regarding collective bargaining.  Ex. 20, p. 41 lines 16-20; p. 42 lines 1-12.

308.

54.     On June 10, 2009, Chief Alcala made a recommendation to Undersheriff Hall that Plaintiff be terminated from the Pueblo County Sheriff's Office. See Def. Ex. A-57.  Of note, the most severe forms of discipline Plaintiff had received prior to Chief Alcala's recommendation for termination were two (2) written reprimands dated February 28, 2002 and July 2, 2008.  Def. Ex. A-57.[10]

55.      Calling to question Chief Alcala's recommendation for termination is that since October 2002, the Plaintiff has exceeded or occasionally exceeded the expectations of the Sheriff's Office regarding his job performance.  This means that the work of the Plaintiff, since 2002, was either consistently of excellent quality or the work is often higher than average quality and mistakes are extremely rare.  (Attached hereto as Exhibit 21 are the evaluation summary pages for Plaintiff since 2003).

56.     On June 16, 2009, the Plaintiff met with Undersheriff Hall to explain his position on the allegations set forth in Inspector Proud's May 28, 2009 memorandum.  Ex. 1, p.291 lines 9-25; p. 292 lines 1-4.  Contrary to Defendants' position, Plaintiff expressed, either in the June 16th meeting or before, that he believed that he was being retaliated against by the Sheriff's Office.  Ex. 1, p. 293, line 1; p. 294 lines 1-25; p. 295 lines 1-25; p. 296 lines 1-2.  Despite this claim, Undersheriff Hall sustained and recommended termination.  See Def. Ex. A-59.

57.     On June 25, 2009, the Plaintiff met with Sheriff Taylor regarding the recommendations of termination through the chain-of-command.  Def. Ex. A-61.

58.     As Sheriff Taylor testified in his deposition, in order to receive due process a Sheriff's

---

[10] Plaintiff became aware that Deputy Flores, who was charged criminally for the Tumbleweed Tavern bar fight, was not terminated from the Sheriff's Office.  Ex. 2.  Instead he received a suspension.  Ex. 2.  Unlike the Plaintiff, Deputy Flores was not active in trying to get collective bargaining within the Sheriff's Office. Ex. 2.

Deputy has a right by Colorado Statute to meet with the Sheriff in cases of termination, suspension, loss of pay or loss of rank.  Ex. 10, p. 34 lines 18-25; p. 35 lines 1-25, p. 36 lines 1-10.  Sheriff Taylor also admitted in his deposition that his disciplinary process would lose credibility if he prejudged a case and that it would be unfair to an employee if the Sheriff came to the pre-disciplinary meeting prejudging the case.  Ex. 10, p. 39 lines 11-25; p. 40 lines 15-18.  Despite Sheriff Taylor's beliefs on due process and maintaining the credibility of his office's disciplinary procedures, prior to the June 25, 2009 pre-disciplinary meeting with the Plaintiff the Sheriff had already drafted and prepared his letter of termination.  See Def. Ex. A-62; Ex. 10, p. 48 lines 7-13.

59.      During the pre-disciplinary meeting with Sheriff Taylor the Plaintiff provided information to rebut the findings made by the chain-of-command.  Ex. 1, p.301 lines 12-25.

60.      In rebutting the findings made by the chain-of-command, specifically the allegation that he harassed an inmate on May 12th, the Plaintiff provided to Sheriff Taylor the name of Lawrence Lock. Ex. 10, p. 99 lines 5-13.   As Sheriff Taylor testified in his deposition, one of the issues that supported his reason to terminate the Plaintiff was the allegation that the Plaintiff harassed an inmate at the Tumbleweed on May 12th.  Ex. 10, p. 98 lines 2-13.  Regarding this issue Sheriff Taylor testified as follows in his deposition:

A: We didn't know the name of the inmate.  We didn't know the name of the inmate until June 25th, when I instructed Sergeant McLallen to give me the name of the inmate so that we could finish the investigation on that issue.
Q: So during your meeting with Mr. McLallen, he gave you the name Lawrence Lock on June 25, 2009; correct?
A: Correct.

Ex. 10, p. 99 lines 5-13

Q: Well, once Mr. McLallen gave you the name Lawrence Lock, why didn't you just postpone your meeting with him and have the interview of Lawrence Lock to find out whether or not the statements by Mr. Reese were in fact corroborated by this inmate? Why didn't you do that?
A: I don't know.
Q: You don't know why you didn't do that?
A: That's my answer.

Ex. 10, p. 99 lines 18-25; p. 100 line 1.

Q: Even though he gave you the name of the inmate, did you postpone or defer your decision to terminate my client until after you had investigated that inmate?

A: No.

Ex. 10, p. 100 lines 25-25; p. 101 lines 1-3.

Q: [A]fter Inspector Proud having interviewed Mr. Lock - - that Mr. Lock actually discredits Reese's statement? Would you agree with that.

A: He gives a different rendition, yes.

Q: And he does not corroborate Mr. Reese's statement that my client was harassing him? Would you agree with that statement?

A: I believe he corroborates that Deputy Flores was actually the primary button pusher. That was the verbiage that was used - - "button pusher."

Q: Is it your understanding that Mr. Lock stated that my client harassed him?

A: No, that Deputy Flores was actually the primary button pusher….

Ex. 10, p. 102 lines 3-19.

61.     Lawrence Lock was interviewed after Plaintiff's pre-disciplinary hearing with Sheriff Taylor.

Ex. 2.  Despite having the name Lawrence Lock, Sheriff Taylor did not postpone the pre-disciplinary hearing and instead moved forward and terminated the Plaintiff.  Ex. 10, p. 100 lines 25-25; p. 101 lines 1-3; See Def. Ex. A-62.

62.     The action of Sheriff Taylor during the June 25th meeting runs afoul of his own departmental policy, specifically the policy concerning complaints, investigations and discipline.  See Def. Ex. A-31.  Of note, "[i]t is the policy of the sheriff's office to conduct fair and impartial investigations of any complaints.  **This office is committed to clearing employees who are falsely accused** and correct those who violate policy and procedure."  Def. Ex. A-31.  It is of concern that Sheriff Taylor did not follow the above departmental policy in clearing Plaintiff's name when given information that may (and did) discredit Mr. Reese's allegations against the Plaintiff.  Ex. 2.  This fact alone corroborated Plaintiff's fears that Sheriff Taylor was going to fire him because of his union activities.  Ex. 2.

**C.**  **Aftermath**

63.   Since Plaintiff's termination Lodge 7 stopped trying to obtain collective bargaining.   Ex. 4.

Lodge 7 also dropped out of the FOP labor council.   Ex. 4.

## LEGAL ARGUMENTS

### Standard of Review

Summary judgment is appropriate only if the evidence shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c);  *Kent v. Martin*, 252 F.3d 1141, 1143 (10th Cir. Okla. 2001).  Defendants' Motion should be denied as Defendants have failed to meet their initial burden of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that the party is entitled to summary judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Even if this Court finds that Defendants properly supported a motion for summary judgment, Plaintiff is able to show a genuine factual issue for trial and that summary judgment is not appropriate as a matter of law. *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "The court views the record and draws all favorable inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

### I.    Plaintiff's First Amendment Claim

a.   Hall, Alcala, Defusco and Proud also caused Plaintiff to suffer a cognizable injury

Defendants are in error that because Defendants Hall, Alcala, Defusco and Proud did not

terminate the Plaintiff that causation of Plaintiff's injury cannot also be attributed to these Defendants.

A case contradicting Defendants' position is *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1114-1115 (10th Cir. 2004). In *Hardeman*, the plaintiff claimed that her criticism of the administration and of fellow city employees led to her discharge in violation of her First Amendment Rights. *Hardeman*, 377 F.3d at 1110. The plaintiff named as defendants the City of Albuquerque, the Mayor and her former supervisor. In defense of the claim, the plaintiff's supervisor argued that because the plaintiff served at the pleasure of the Mayor, only the Mayor could terminate the Plaintiff and therefore the supervisor had no liability. *Hardeman*, 377 F.3d at 1115. Contradicting this position was evidence that the supervisor had power and influence in the administration with such influence contributing to the Mayor's decision to terminate the plaintiff. *Id.* Accordingly, the Tenth Circuit upheld the jury's verdict that (despite the fact that the plaintiff served at the pleasure of the Mayor) the supervisor had violated plaintiff's First Amendment rights, for the supervisor had influence over the Mayor's decision to release the plaintiff from employ. *Id.*

Similar to *Hardeman*, Defendants Hall, Alcala, Proud and Defusco had all participated and influenced the Sheriff's decision to terminate the Plaintiff. [¶¶30-62].[11] As indicated above, starting with the Birchfield matter, going into Inspector Proud's investigation into the Tumbleweed incidents and through the chain-of-command in the disciplinary process, it is apparent that actions were taken by these Defendants to either create factual issues to support policy violations or recommend discipline which was not supported by the evidence. [¶¶30-62]. The true motivation by these Defendants was candidly summarized by Betty McCoy when she stated that the chain-of-command criticized the Plaintiff because he was fighting for union rights and that the chain-of-

---

[11] Similar to Defendants, for ease of reference, citations to factual references in this Response are made to the paragraph numbers in the above Statement of Disputed Facts.

command supported Sheriff Taylor's position on collective bargaining.  [¶¶52-53].  Ms. McCoy also believed that during his disciplinary process the Plaintiff was not being treated fairly.  [¶¶52-53].

To that end, the Sheriff did not discard the recommendations made by the Defendants.  In fact the converse is true.  Sheriff Taylor used the facts as presented by Inspector Proud and the recommendations made by the chain-of-command to support his decision to terminate the Plaintiff.  [¶¶57-58].  Taking the rationale in *Hardeman*, but for Defendants Hall, Alcala, Proud and Defusco presenting facts and making the recommendations for termination to the Sheriff, Plaintiff would not have been administratively positioned to be before the Sheriff on grounds of termination.  In other words, these Defendants used their influence (being the chain of command) to get the Plaintiff terminated, with the Sheriff knowingly accepting the conduct of these Defendants by sustaining termination.[12]

Accordingly, Defendants Hall, Alcala, Proud and Defusco, as a matter of law, have liability in this matter.

b.      Plaintiff's official capacity claims are duplicative

Having reviewed the cases cited by Defendants, Plaintiff concedes that the claims against Defendants Hall, Alcala, Proud and Defusco in their official capacities are duplicative of the claims against Sheriff Taylor in his official capacity.

c.      Plaintiff's First Amendment claim against Sheriff Taylor does not fail

**First Amendment - Freedom of Speech**

Where a government employer takes adverse action because of an employee's exercise of his or her right of free speech, we apply the balancing test from *Pickering v. Board of Educ.*, 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968), and *Connick v. Myers*, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S.

---

[12] The Tenth Circuit in *Halderman* did not find it dispositive that plaintiff served at the pleasure of the Mayor.

Ct. 1684 (1983) (the "Pickering/Connick test"); *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. Okla. 1999). Here, it is clear that Defendants failed to meet their initial burden which was to demonstrate that they are entitled to summary judgment on Plaintiff's First Amendment Free Speech claim. Even if this Court finds that Defendants properly supported a motion for summary judgment on the issue of free speech, Plaintiff is able to show a genuine factual issue for trial and that summary judgment is not appropriate as a matter of law.

As a starting point, Defendants concede that Plaintiff's "activities with the FOP and the effort to obtain collective bargaining are matters of public concern protected by the First Amendment." Def. Motion for Summary Judgment, p. 25. Accordingly, Defendant concedes the first factor in the Pickering/Connick test. Under the second Pickering/Connick prong, the employee's First Amendment free speech rights are protected "unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Gardetto v. Mason*, 100 F.3d 803, 815-816 (10th Cir. Wyo. 1996). Relevant considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* The government, however, cannot rely on purely speculative allegations that certain statements caused or will cause disruption to justify the regulation of employee speech. *Wulf v. City of Wichita*, 883 F.2d 842, 862 (10th Cir. 1989). Furthermore, the government's concerns about the impact of speech must be reasonable and formed in good faith. *Waters v. Churchill*, 511 U.S. 661 (1994).

In the instant case, Sheriff Taylor's position is that he has not regulated Plaintiff's speech. In fact, Sheriff Taylor concedes that Plaintiff's termination was due to "his own actions on April 18, 2009, May 2-3, 2009, and May 12, 2009, and not because of his being the President of the FOP or

anything related to that status." Def. Motion for Summary Judgment, p. 25.; *See also* Def. Ex. A-23, A-25, A-62.   Further, Sheriff Taylor has never once uttered a predication or concern about workplace disruption or an interest in efficient law enforcement or any other government employer's interest in regulating the speech of Plaintiff so that he can ensure an efficient and effective workplace.   Although law enforcement predictions of disruption are due some deference, the Pickering balancing test **only** need be conducted if a government employer has produced evidence of workplace disruption.   *Shockency v. Ramsey County*, 493 F.3d 941, 949 (8th Cir. Minn. 2007).   Tellingly, Defendants have advanced **no** evidence of workplace disruption.   Accordingly, this Court must conclude that Plaintiff's interest in protected speech (i.e. union activities, collective bargaining, and his testimony to the General Assembly) must outweigh the government employer's interest in regulating the speech where the government employer claims he never even regulated Plaintiff's speech nor has he advanced any interest in regulating Plaintiff's protected speech.

Prongs one and two of the Pickering/Connick test concern whether the expression at issue is subject to the protection of the First Amendment.   *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. Wyo. 1996).   Thus, they present legal questions to be resolved by the court.   Id.   In contrast, the third and fourth steps concern causation and involve questions of fact to be resolved by the jury.   Id.   Accordingly, because Plaintiff is easily able to satisfy prongs one and two of the Pickering/Connick test coupled with the fact that prongs three and four concern causation and involve question of disputed fact to be resolved by the jury summary judgment is not appropriate as a matter of law.

Under the third Pickering/Connick prong, Plaintiff must show that the "speech was a substantial factor driving his challenged governmental action".   *Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. Okla. 1999). The evidence in this case supports the conclusion that Plaintiff's speech was a substantial factor driving the Defendants' campaign of retaliation.   *See* Disputed Facts, Section A & B.   Defendants advance three arguments in support for their contention that Plaintiff cannot

meet his burden of demonstrating that Plaintiff's protected speech was a substantial factor driving his termination and other adverse employment actions: 1. Sheriff Taylor terminated Plaintiff for legitimate disciplinary reasons; 2. The nature of Sheriff Taylor's position on collective bargaining; and 3. The timing of the events does not support an inference of any retaliatory motive.  Plaintiff will address each argument in turn.

As a starting point, each of Defendants' three arguments concerning the third prong of the Pickering/Connick test fail due to the legal standards required to achieve summary judgment. Summary judgment is appropriate only **if** the evidence shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c);  *Kent v. Martin*, 252 F.3d 1141, 1143 (10th Cir. Okla. 2001).  "The court views the record and draws all favorable inferences in the light most favorable to the non-moving party."  *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).  All three of Defendants arguments concerning the third prong of the Pickering/Connick test are confronted by genuine issues as to numerous material facts.  Further, when viewed in the light most favorable to the non-moving party (i.e. Plaintiff) summary judgment is not appropriate as a matter of law.

As it relates to Defendants first argument concerning the third prong of the Pickering/Connick test, there are numerous dispute facts that when taken in the light most favorable to Plaintiff demonstrate that Plaintiff was terminated due to his union activity, collective bargaining efforts and testimony before the General Assembly and not for legitimate disciplinary reasons as Sheriff Taylor claims.  *See* Disputed Facts, Section A & B.  By way of example, concerning the Birchfield incident, which occurred only two months after Plaintiff's testimony before the General Assembly and while he continued to serve as the FOP Lodge 7 president and while he was engaged in union activities and collective bargaining efforts, Plaintiff received a five-day suspension for going "hands-on" with inmate Birchfield while Lt. Purkett who also went "hands-on" was not even

investigated.   [¶¶28-37].   Another example is the fact concerning the May 12th Tumbleweed incident, Sheriff Taylor clearly ignored exculpatory evidence that exonerated Plaintiff of any wrongdoing despite his own express policy and procedure which is to consider such evidence in order to clear employees who are falsely accused.   [¶¶38-62].

Defendants' second argument concerning the third prong of the Pickering/Connick test is premised on recognizing the "nature of Sheriff Taylor's position concerning collective bargaining for Sheriff's Office employees".   Def. Motion for Summary Judgment, p. 26.   In essence Defendants' second argument is supported by the naked assertion that Sheriff Taylor "is personally supportive of collective bargaining" and "was not antagonistic to the FOP generally" and therefore Plaintiff's protected speech could not have been a substantial or motivating factor.   Defendants' argument is without merit as it is completely contradicted by the record.   [¶¶1-62].   At the very least, this naked assertion by Defendants is a genuine issue of material fact which should be properly resolved by the jury.

Finally, Defendants' third argument concerning the third prong of the Pickering/Connick test is premised on the time of the events.   Defendants contend that the FOP's efforts to obtain collective bargain rights and Plaintiff's testimony in front of the General Assembly are too attenuated to support a retaliatory motive.   Def. Motion for Summary Judgment, p. 27.   The 10th Circuit has held that "the causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982).   However, "unless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation."   *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). In *Meiners*, the 10th Circuit determined that a "six-week period between protected

activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient." *Id.* In *Miller v. Auto. Club of New Mexico* cited by Defendants, the Court found that a six month window between Ms. Miller's allegations of sexual discrimination and the elimination of her hourly position alone is insufficient to establish a prima facie case, and Ms. Miller does not point to much other evidence to support her cause. *Miller v. Auto. Club of New Mexico, Inc.*, 420 F.3d 1098, 1121 (10th Cir. N.M. 2005).

The instant case is easily distinguishable for *Miller*. First, at all times material, Plaintiff was the FOP Lodge 7 President engaged in union activities and making efforts to obtain collective bargaining rights for his union members. Accordingly, at the precise time of his termination Plaintiff was engaged in the protected speech that ultimately got him fired. Accordingly, the adverse action occurred at the same moment that Plaintiff was engaged in the protected activity. As a consequence, Plaintiff need not rely on additional evidence beyond mere temporal proximity to establish causation. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). Despite the fact that Plaintiff can meet his burden and establish the casual connection based purely on the temporal proximity he is able to support his position that Plaintiff's protected activities were a substantial and motivating factor in his termination with a mountain of additional evidence. [¶¶1-62]. Lastly, Defendants argue that the "intervening" events of April 18, 2009, May 2-3, 2009, and May 12, 2009 are wholly unrelated to Plaintiff's protected activities and his termination. The so called "intervening" events bolster Plaintiff's contention that his protected activities were a substantial and motivating factor in his termination. Again, Plaintiff received a five-day suspension for going "hands-on" with inmate Birchfield while Lt. Purkett who also went "hands-on" was not even investigated. [¶¶28-37].[13]

---

[13] The Department held the five-day suspension in abeyance and used the Birchfield incident as grounds for termination.

Tellingly, Lt. Purkett was a higher rank but was not engaged in the protected activities that Plaintiff was engaged.  Further dispelling with the "intervening argument" is that during the June, 2009 pre-disciplinary meeting Sheriff Taylor intentionally ignored exculpatory evidence that exonerated Plaintiff of any wrongdoing despite his own express policy and procedure to the contrary.  [¶¶38-62].  There is no evidence that Sheriff Taylor has ignored this policy as it relates to any other employees except Plaintiff.  *See* [¶¶1-62] generally for numerous other examples.

Under the fourth Pickering/Connick prong, the burden shifts to Defendants to demonstrate that they would have taken the same employment action against Plaintiff even in the absence of the protected speech.  *Jantzen*, 188 F.3d at 1257.  For the reason set forth above, Defendants are not able to meet this burden but nevertheless this is a genuine issue as to any material fact for the jury to decide.  The first two parts . . . are questions of law for the court; the remaining two steps are questions of fact for the jury."  *Jantzen*, 188 F.3d at 1257.

## First Amendment – Freedom of Association

The First Amendment protects the right of a public employee to join and participate in a labor union.  *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434, 1438 (10th Cir. N.M. 1990); *See also Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*, 2008 U.S. Dist. LEXIS 82523 *11-12 (D. Colo. Sept. 16, 2008)(The Honorable Judge Walker D. Miller applied the Pickering Test for the Freedom of Association claim as it applies to Union Activity.  Plaintiff's political affiliation claim is based on his affiliation with the FOP and the union activities that he engaged in as the President of FOP Lodge 7.  Based upon *Morfin* and *Blangsted*, the aforementioned analysis is applicable to Plantiff's political affiliation argument.  For the reasons cited above, Defendants are unable to    demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" as it relates to this claim.  Fed. R. Civ. P. 56(c).  Accordingly, to the extent that Defendants seek summary judgment on Plaintiff's Freedom of Association claim their request

should be summarily denied.

## II.     Plaintiff's Fourteenth Amendment Claim

a.     <u>Defendants Hall, Alcala, Defusco and Proud did cause Plaintiff to suffer a cognizable injury</u>

These Defendants are not entitled to summary judgment on the Plaintiff's Fourteenth Amendment claim on the same basis as set forth and argued in Section (I)(a) above.

b.     <u>Plaintiff has a protected property interest in his job</u>

To determine whether a plaintiff was denied procedural due process, the Court must engage in a two-step inquiry: (1) did the individual possess a protected interest to which due process protection was applicable and (2) was the individual afforded an appropriate level of process. *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998). To properly allege a violation of his procedural due process rights, Plaintiff must first demonstrate that he had a protected property interest in his employment. *Hennigh*, 155 F.3d at 1255. The standard for the existence of a property right in employment is whether the Plaintiff has a legitimate expectation of continued employment. *See Hennigh,* 155 F.3d at 1253. As the Tenth Circuit Court of Appeals has held, if state statutes or regulations place substantive restrictions on a government actor's ability to make personnel decisions, then the employee has a protected property interest. *See Campbell v. Mercer*, 926 F.2d 990, 993 (10th Cir. 1991)

Here, Colorado legislature elected to restrict a Sheriff's ability to make personnel decisions by requiring that prior to discipline being rendered all Sheriffs must first provide notice and an opportunity to be heard. See C.R.S. § 30-50-106; *see Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541-42, 105 S.Ct. 1487, 84 L.Ed 2d 494 (1985); *see also*, H.B.06-1181, Colorado General Assembly Digest of Bills 2006 (which is attached hereto as Exhibit 22)[14]. Accordingly, Plaintiff has

---

[14] H.B. 06-1181 is otherwise known as C.R.S. § 30-50-106. As Exhibit 22 indicates, in 2006 the General Assembly passed an amendment to the pleasure statute to specifically limit "the power of a

a property interest in his job for he had a reasonable expectation that he could not be terminated without the Sheriff providing due process by way of notice and an adequate and fair opportunity to be heard.  Ex. 19; see L*oudermill*, 470 U.S. at 541-42; *Hennigh*, 155 F.3d at 1253; *see also, Koopman v. Water Dist. No. 1*, 972 F.2d 1160, 1165 (10th Cir. 1992). *See* Ex. 2.  This expectation by the Plaintiff that Deputy Sheriffs have a property interest in a Colorado Sheriff's Office was also shared and corroborated by Sheriff Taylor.  Ex. 9, p. 18, lines 10-25; pp. 19-23.  In fact, like the Plaintiff, Sheriff Taylor believed that due process for Colorado Deputy Sheriffs was mandated under C.R.S. § 30-10-506 and the Fourteenth Amendment to the United States Constitution.  Ex. 10, p. 19 lines 13-21; p. 34 lines 18-25; p. 35 lines 1-14.  To that end, Plaintiff's belief that he had a property interest in his job was not unilateral but rather a mutual understanding with Sheriff Taylor as evidenced by the Sheriff's deposition testimony.  *Curtis Ambulance of Florida, Inc. v. Board of County Comm'rs*, 811 F.2d 1371, 1376 (10th Cir. 1987) (While the typical claim of entitlement is based upon specific statutory or contractual provisions, it need not be. Rather, a person's interest in a benefit is a "property interest" for due process purposes if there are rules or *mutually explicit understandings* that support his claim of entitlement to the benefit); *Jones v. University of Central Okla.*, 13 F.3d 361, 365-64 (10th Cir. 1993).   In light of the facts in this case, and following the rationales in *Curtis* and *Jones*, Plaintiff has a property interest in his employment with Pueblo County Sheriff's Office.

In an effort to dissuade this Honorable Court that the Plaintiff had a property interest in his job is Defendants' citation to *Nicastle v. Adams County Sheriff's Office*, 2011 U.S. Dist., Lexis 46500 (D. Colo. Apr. 29, 2011).  Distinguishing *Nicastle* from the case-at-hand are the following facts: (1) unlike here, Sheriff Darr did not have a mutual understanding with plaintiff *Nicastle* that the plaintiff had due process rights conferred under State and Federal law and (2) unlike here, plaintiff *Nicastle* did

---

county sheriff when revoking the appointment of a deputy at will….".  See Ex. 22.  The amendment also gave a deputy sheriff "the **right** to prior notice of the reason for a proposed revocation of an appointment and an opportunity to be heard by the sheriff."  See Ex. 22[Emphasis added].

not have his appointment revoked by the Sheriff but instead was demoted.  *Nicastle v. Adams County Sheriff's Office*, 2011 U.S. Dist., Lexis 46500 *13-14 (D. Colo. Apr. 29, 2011).[15]

Equally inapplicable is Defendants' citation to *Darr v. Town of Telluride*.  Diverging from the legal and factual issues in this case is that in *Darr* the statutory provision giving procedural due process and property rights to Plaintiff under C.R.S. § 30-10-506 was not amended (or enacted) at the time *Darr* was terminated.  *Darr v. Town of Telluride*, 495 F.3d 1243, 1250 (10th Cir. 2007) (Darr was terminated on July 21, 2003).  To that end, Darr was not arguing that his due process rights were created by statute but instead argued that his property interest was created by an outdated departmental policy.  *Darr*, 495 F.3d at 1251-52.  Because the factual and legal issues in *Darr* are so dissimilar to the issues in this case, *Darr* is not applicable to the case-at-hand.

c.      <u>Plaintiff did not receive all of the due process required under the law</u>

Having established the first prong of the two (2) step inquiry the next issue is whether Defendants afforded an appropriate level of process before terminating the Plaintiff.  *Hennigh*, 155 F.3d at 1253.  Where Plaintiff received notice of discipline there are factual issues in dispute about whether Plaintiff was afforded an adequate opportunity to be heard.  Here, an issue arises regarding whether Sheriff Taylor (the decision maker) prejudged the facts in this case before his June 25, 2009 pre-disciplinary meeting with the Plaintiff.  *Tepley v. Public Emples. Retirement Ass'n*, 955 P.2d 573, 578-579 (Colo. App. 1997) (Due process is denied when an administrative decision maker prejudges matters of evidentiary fact that are dispositive of the case).  Sheriff Taylor admits that his disciplinary process would lose credibility if he prejudged a case and that it would be unfair to an employee if the

---

[15] Judge Blackburn took note that C.R.S. § 30-10-506 does not create a property interest in a particular rank held by a sheriff's employee as the statute only addresses revocation of an appointment.  Judge Blackburn further comments that the statute provides procedural versus substantive safeguards; however, distinguishing this holding is the specific fact that Sheriff Taylor recognizes due process for his deputies.  Thus, the holding in *Curtis* is more apposite on this matter than *Nicastle*.

—

Sheriff came to the pre-disciplinary meeting prejudging the facts giving rise to discipline.  [¶ 58].

Despite Sheriff Taylor's beliefs on due process and maintaining the credibility of his office's

disciplinary procedures, prior to the June 25, 2009 pre-disciplinary meeting with the Plaintiff the

Sheriff had already drafted and prepared his letter of termination.  [¶ 58].  This fact gives credence to

Plaintiff's supposition that despite whatever rebuttal and mitigating statements Plaintiff would make,

Sheriff Taylor had already decided before the pre-disciplinary meeting that he was going to terminate

the Plaintiff.  This fact indicates that Plaintiff was not given an "adequate opportunity to be heard."

Accordingly, Plaintiff's due process rights were violated.

Plaintiff's due process rights were further violated when the Sheriff's Office failed to follow

departmental policy regarding its commitment in clearing Plaintiff's name when faced with

"exculpatory" evidence that Plaintiff did not violate departmental policies.  *Department of Health v.*

*Donahue*, 690 P.2d 243, 249 (Colo. 1984) *citing Perry v. Sindermann*, 408 U.S. 593, 33 L.Ed. 570, 92 S.

Ct. 2694 (1972) (A public employer's failure to provide an employee with the benefits of a procedure

as required by policies which it has adopted is a violation of the employee's procedural due process

rights); see also *Curtis*, 811 F.2d at 1376; *Jones*. 13 F.3d at 365-64.  As stated above, "it is the stated

policy of the sheriff's office to conduct fair and impartial investigations of any complaints.  This

office is committed to clearing employees who are falsely accused and correct those who violate

policy and procedure."  [¶ 62]  Under this policy, it was Plaintiff's belief that when given information

to Sheriff Taylor about Mr. Lock (which would have clearly exonerated Plaintiff concerning the May

12th incident) that the Sheriff would have investigated the matter in accordance with policy.  Ex. 2.

Despite Plaintiff's efforts and reliance on the policy, Sheriff ignored the exculpatory material and

instead elected to terminate the Plaintiff.  [¶¶ 60-62].  Such action also violated Plaintiff's due

process rights.  *Donahue*, 690 P.2d at 249.

d.    Plaintiff's liberty interest under the Due Process clause was violated

Plaintiff concedes that he cannot meet all the requisite elements for a violation of a liberty

interest claim.

**III.    Plaintiff's state law claims are not precluded by the Colorado Governmental Immunity Act**

Defendants correctly state that under C.R.S. § 24-10-101 (the Colorado Governmental

Immunity Act or "CGIA") that a public entity shall be immune from liability on all claims for injury

which lie in tort or could lie in tort except as provided otherwise under C.R.S. § 24-10-106(1).  Def.

Motion for Summary Judgment, p. 35.   Reviewing Defendants' Motion for Summary Judgment

reveals that the Defendants are conceding that the Office of the Sheriff is a public entity and the

remaining Defendants (for purposes of this action) are public employees under the CGIA.   Def.

Motion for Summary Judgment, p. 35.  Thus, the issue becomes whether Plaintiff's state law claims

fall within the purview of immunity under the CGIA.  To that end, Plaintiff will address his state law

claims in turn below.

Under C.R.S. § 8-2.5-101, "It is unlawful for any person…to take any action against its

employees…for, testifying before a committee of the general assembly or a court of law or speaking

to a member of the general assembly at the request of such committee, court, or member regarding

any action, policy, rule, regulation, practice, or procedure of any person or regarding any grievance

relating thereto."  In this case, the relevant definition of "person" under the statue includes: a state

agency as defined in C.R.S. § 24-50.5-102(4), a county, a city and county, a municipality, a federal

agency, an individual, or any officer or agent thereof.  See C.R.S. § 8-2.5-101(4).  In addition, the

accompanying statute also defines employee as any person employed by a state agency.  See C.R.S. §

24-50.5-102(4).

It is clear that based upon the language of C.R.S. § 8-2.5-101 that the State Legislature

intended to create a right of recovery for an employee against a public agency when an agency (or

public employee(s)) violates the statute.   (Attached hereto as Exhibit 23 are General Assembly Digest of Bills H.B. 97-1224 and H.B. 98-1378).[16]  This notion is further memorialized in *Conners v. City of Colorado Springs*, 962 P.2d 294, 296 (Colo. App. 1997).   In *Conners*, the Colorado Court of Appeals gave examples of state statutes that do not fall with the provision of the CGIA.  One of the examples given by the Court were claims arising under C.R.S. § 8-2.5-101(1)(b).  *Conners*, 962 P.2d at 296.  In light of this holding, it is apparent that the Colorado Court of Appeals views claims that are brought under C.R.S. § 8-2.5-101 as state law claims which are not subject to immunity under the CGIA.   Accordingly, Defendants' argument that Plaintiff's claim under C.R.S. § 8-2.5-101is precluded under the CGIA, is without merit.

Plaintiff concedes that as a matter of law he cannot establish a violation of public policy. Accordingly, Plaintiff will agree to dismiss with prejudice his public policy claim.

**IV.     Defendants are not entitled to summary judgment on Plaintiff's C.R.S. § 8-2.5-101 claim**

C.R.S. § 8-2.5-101 provides, in relevant part, that it is unlawful for any person "to take any action against its employees . . . under its control or oversight solely for testifying before a committee of the general assembly…."  As it relates to this statute, Defendants' argue that in order for Plaintiff to succeed on this claim that Plaintiff must be able to show that the termination was based solely on his testimony before the General Assembly.   See Def. Motion for Summary Judgment, p. 41.  As this Court is aware, contained within Plaintiff's Complaint are various claims for relief.   Such claims for relief include: (1) a First Amendment Violation; (2) Fourteenth Amendment Due Process Violation; (3) Public Policy claim and (4) Violation of C.R.S. § 8-2.5-101. Where Plaintiff strongly believes in the merits of his claims, as explained more fully herein, the Plaintiff also pled claims in the alternative.   To that end, a jury could find that Defendants

---

[16] Both H.B. 97-1224 and H.B. 98-1378 address amendments to C.R.S. § 8-2.5-101.  As the Exhibit indicates, an employee has a right of recovery public entity that violates the statute.

terminated the Plaintiff in violation of his First and/or Fourteenth Amendment rights or in the alternative the jury could find that Defendants violated C.R.S. § 8-2.5.-101 when Plaintiff testified before the General Assembly in February, 2009.

Plaintiff cannot state unequivocally that Sheriff Taylor terminated Plaintiff "solely" because of his testimony before the General Assembly; however, Plaintiff can state that there are sufficient facts in this case which support both legal theories that Sheriff Taylor either terminated the Plaintiff because of union activity (in violation of his First Amendment rights) or terminated the Plaintiff because he testified before the General Assembly.  [¶¶25-27] and [¶¶58-62].  For instance, a jury could find that based on the totality of events, including Plaintiff's testimony before the General Assembly, that Sheriff Taylor elected to terminate the Plaintiff in violation of the First Amendment. Alternatively, the jury could also find that all the events leading up to the General Assembly testimony did not draw the ire of the Sheriff until after the Plaintiff testified on February 16, 2009. [¶¶26-27].  A jury could find that it is of no coincidence that only a couple of months after February 16, 2009 that the Plaintiff received three (3) internal affair investigations; then subsequently terminated on less than solid evidentiary grounds; and Sheriff Taylor electing not reopen the investigation after receiving exculpatory evidence that exonerated the Plaintiff. [¶¶28-62].  A jury could find and certainly determine that based upon these facts that Defendants only took adverse employment actions against the Plaintiff because of the February 16, 2009 General Assembly testimony.

Accordingly, the Defendants' Motion for Summary Judgment must be denied as Plaintiff is able to show a genuine factual issue for trial. *Pietrowski*, 134 F.3d at 1008

## CONCLUSION

In conclusion, for all of the forgoing reasons, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion for Summary Judgment, and for all other and further relief as this Court deems just and appropriate.

Dated this 29th day of July, 2011

Elkus & Sisson, P.C.

*s/ Reid J. Elkus*
Reid J. Elkus
Donald C. Sisson
1660 Lincoln St. Suite 1750
Denver, Colorado 80264
Telephone: (303) 567-7981
Fax: 303-832-1188
Email: relkus@elkusandsisson.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2011, a copy of this **PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT** was served upon the following via first-class mail, postage prepaid, and addressed to:

Andrew D. Ringel
Hall & Evans, LLC
1125 Seventeenth St., Suite 600
Denver, Colorado 80202
Telephone: (303) 628-3300
Fax: 303-628-3368
Email: ringela@hallevans.com

*s/ Margo Parker*
Margo Parker